462 F.Supp.2d 1150 (2006)
WILDWEST INSTITUTE, Plaintiff,
v.
Bob CASTANEDA, in his official capacity as Forest Supervisor for the Kootenai National Forest; Abagail Kimbell, Regional Forester of Region One of the U.S. Forest Service; and, United States Forest Service, an agency of the U.S. Department of Agriculture, Defendants, and
F.H. Stoltze Land & Lumber Co., Fousts, Inc., Regehr Logging, Inc., Ponderay Valley Fibre, Inc., and Lincoln County, Defendant-Intervenors.
No. CV 06-24-M-DWM.
United States District Court, D. Montana, Missoula Division.
November 21, 2006.
*1151 *1152 *1153 Thomas J. Woodbury, Forest Defense, Missoula, MT, for Plaintiff.
Mark Steger Smith, Office of the U.S. Attorney, Billings, MT, for Defendants.
Julie A. Weis, Scott W. Horngren, Haglund Kelley Horngren Jones & Wilder, Portland, OR, Patrick G. Frank, Worden Thane, Missoula, MT, for Defendant-Intervenors.

ORDER
MOLLOY, Chief Judge.

I. Introduction
Plaintiff, Wildwest Institute, is challenging the United States Forest Service's approval of nine logging projects in the Kootenai National Forest ("KNF"). The challenged projects include the Bristow Area Restoration Project (DN June 16, 2004), the Fortine Project (ROD October 12, 2004), the West Troy Project (ROD June 14, 2004), the Pipestone Timber Sale and Restoration Project (ROD June 2, 2004), the Lower Big Creek Project (ROD June 30, 2004), the South McSwede Timber Sale and Restoration Project (DN June 16, 2004), the Alder Creek Project (DN June 16, 2005), the Cow Creek Project (DN June 16, 2005), and the McSuttan Project (ROD May 12, 2005). Plaintiff raises claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq. Before the Court are the parties' cross-motions for summary judgment, Plaintiffs motion to supplement the record, and Defendants' motion to strike Plaintiffs supplemental materials.

II. The Parties Arguments
A. Plaintiff  wildwest Institute
The crux of Plaintiffs argument is that flawed, forest-wide management practices in the KNF render the Forest Service's approval of the nine challenged projects unlawful. Plaintiff places great reliance on the results of the 1993 Draft Five-Year *1154 Monitoring and Evaluation Report (the "1993 Draft Report"). According to Plaintiff, the 1993 Draft Report revealed numerous deficiencies in the management practices being implemented in the KNF. Plaintiff claims, instead of addressing these deficiencies by amending the Forest Plan, the Forest Service merely abandoned the five-year review process, and thus many of the problems that existed in 1993 still exist today. Specifically, Plaintiff challenges management practices relating to the use of forest plan amendments, water quality and aquatic habitat, old growth, soil productivity, and noxious weeds. Plaintiff argues the ineffective management practices render the challenged projects unlawful.
B. Defendants  Bob Castaneda, Abigail Kimbell, and the United States Forest Service
Defendants first claim Plaintiff has abandoned all claims alleged in its Complaint except those based on a cumulative effects theory because Plaintiff failed to address any other claims in its summary judgment brief. Defendants contend Plaintiffs cumulative effects claims are without merit because the Forest Service adequately analyzed the cumulative impact of past, present, and future actions on water quality, old growth habitat, soil productivity, and noxious weeds for each of the challenged projects.
Defendants further contend Plaintiffs attempt to establish forest-wide management problems in the KNF by relying on monitoring data from over ten years ago must fail. According to Defendants, Plaintiff has not presented any evidence to suggest conditions from 1993 still exist today. Defendants note the five-year review process is no longer required by law, but assert the Forest Service has continued to conduct monitoring as required by the Forest Plan.
C. Defendant-Intervenors  Logging Companies
Defendant-Intervenors claim Plaintiffs suit, which seeks to affect change in forest-wide management practices, is not viable. Defendant-Intervenors contend Plaintiff is limited to challenging individual projects. Even if a challenge to forest-wide management practices is permitted on the coattails of site-specific projects, Defendant-Interveners argue Plaintiffs suit is directed at the wrong timber sales. Defendant-Intervenors note most of the challenged projects do not require harvest of old growth or construction of roads in old growth habitat.
Defendant-Intervenors also assert Plaintiff's suit is barred by lathes, claim preclusion, and issue preclusion. Defendant-Intervenors point out that the most recent of the challenged projects was approved in June 2005, but Plaintiff did not file suit until February 2006. According to Defendant-Intervenors, permitting Plaintiffs suit to proceed would unduly prejudice logging companies because implementation of the challenged projects has already begun. Defendant-Intervenors further contend many of Plaintiffs claims are barred by issue or claim preclusion because the claims were litigated or should have been raised in Ecology Center, Inc. v. Castenada, CV-02-200-M, 2003 U.S. Dist. LEXIS 26446 (D. Mont. June 27, 2003).
Finally, Defendant-Intervenors argue, if the Court determines the Forest Service's approval of any of the challenged projects violated environmental laws, an injunction should not be issued. Defendant-Intervenors claim halting the challenged projects would harm logging companies, their employees, and the public. Defendant-Intervenors note the challenged projects are largely intended to improve forest health by eliminating dead, dying, or diseased *1155 timber and timber slated for salvage is a perishable commodity.

III. Analysis
A. Standards of Review
Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgement is a particularly appropriate tool for resolving claims challenging agency action. See Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir.1985). When a district court is reviewing the decision of an administrative agency, the administrative agency acts as the fact finder and the district court's role is limited to deciding the legal question of whether the agency could reasonably have found the facts as it did. Id.
Judicial review of an agency's compliance with NFMA and NEPA are governed by the judicial review provisions of the APA. Ecology Ctr., Inc. v. Austin, 430 F.3d 1057, 1062 (9th Cir.2005). Therefore, a district court may set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).
NFMA imposes both substantive and procedural requirements on the Forest Service. Ecology Ctr., 430 F.3d at 1062. NFMA envisions a two-stage approach to forest planning. Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 757 (9th Cir.1996). At the first stage, the Forest Service develops a land and resource management plan for each forest. Id. The forest plan must comply with NFMA's substantive requirements. Id. At the second stage, the forest plan is implemented through individual, site-specific projects. Id. Each project must comply with both the forest plan and NFMA's substantive requirements. Ecology Ctr., 430 F.3d at 1062.
NEPA, on the other hand, imposes only procedural requirements. It requires federal agencies to prepare an Environmental Impact Statement ("EIS") whenever they propose to undertake any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The goal of NEPA is two-fold: to "ensure the agency will have detailed information on significant environmental impacts when it makes its decisions" and to "guarantee that this information will be available to [the public]." Inland Empire, 88 F.3d at 758. NEPA therefore "does not mandate particular results, but simply describes the necessary process that an agency must follow in issuing an EIS." Westlands Water Dist. v. U.S. Dept. of Interior, 376 F.3d 853, 865 (9th Cir.2004) (quotation omitted). In reviewing agency action under NEPA, a district court may not substitute its judgment for that of the agency. Id. Rather, "[i]ts focus must be on ensuring [the agency] took a `hard look' at the environmental consequences of [its] decision[]." Id. A district court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." Id. (quotation omitted).
B. Motions to Supplement and Strike
Plaintiff has filed a motion to supplement the record with various documents. Plaintiff seeks to add eight documents from the administrative record in a prior case dealing with the KNF (No. CV-96-142-M). The most important of these documents appears to be the 1993 Draft Report, *1156 which Plaintiff relies on heavily in its summary judgment briefing. Plaintiff also seeks to add (1) a 1998 memorandum from a KNF hydrologist concerning a proposal to eliminate monitoring item F-2; (2) an undated draft entitled "KNF Sensitive Species Management  Fish"; (3) two Forest Service replies to FOIA requests; and (4) a 1994 memorandum from a Forest Service fish biologist discussing the bull trout.
Defendants oppose Plaintiff's motion. Defendants contend the documents were not part of the administrative process and were not considered by the agency in making its decision to approve the challenged projects. Accordingly, Defendants argue the documents should not be considered by this Court in determining whether the Forest Service's decisions were arbitrary and capricious. Defendants have also filed a motion to strike, seeking to exclude these documents.
When reviewing agency action under the APA, courts are usually limited to consideration of the administrative record that was before the agency when it made the challenged decision. Animal Defense Council v. Hodel, 840 F.2d 1432, 1436 (9th Cir.1988). Extra-record material is only permitted (1) "if necessary to determine whether the agency has considered all relevant factors and has explained its decision;" (2) "when the agency has relied on documents not in the record;" (3) "when supplementing the record is necessary to explain technical terms or complex subject matter;" and (4) "when plaintiffs make a showing of agency bad faith." Inland Empire Pub. Lands Council v. Glickman, 88 F.3d 697, 703-04 (9th Cir.1996) (quotations omitted). Additionally, in NEPA cases, extra-record material may be admitted where the plaintiff alleges "that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism ... under the rug." Or. Nat'l Res. Council v. Lowe, 109 F.3d 521, 526-27 (9th Cir.1997).
The documents Plaintiff seeks to add to the record fit within the exception for extra-record material in NEPA cases. Plaintiff alleges the Forest Service ignored its own monitoring data and concerns from experts regarding forest-wide management practices in approving the challenged projects. The monitoring data and expert concerns relied on by Plaintiff are discussed in the documents Plaintiff seeks to add to the record. Although these documents were arguably not before the Forest Service when it approved the challenged projects, Plaintiff alleges they should have been considered and that by ignoring them the Forest Service was "sweep[ing] problems or serious criticisms ... under the rug." Id. Therefore, the documents fit within an exception to the general rule that extra-record material may not be considered by a reviewing court, and the Court will consider them in ruling on the parties' cross-motions for summary judgment.
In its motion to supplement the record, Plaintiff also requests that the Court compel the Forest Service to supplement the administrative record with all information provided to it by Plaintiff during the NEPA process for each of the challenged projects. The only documents Plaintiff specifically identifies with respect to this request are the Logan Creek Final EIS and a white paper regarding old growth management. See Declaration of Jeff Juel, at ¶¶ 10-11. At oral argument, Plaintiff described the material as a CD-rom containing best-available science. Defendants alternatively indicated that the CD-rom contained numerous articles. Although Defendants acknowledge the Forest Service received the CD-rom, they argue *1157 Plaintiff did not specifically rely on any of the documents on the CD-rom in making comments during the NEPA process.
Plaintiff has not provided the Court with a copy of the CD-rom at issue, and thus, the Court has no way to determine whether the materials contained on it are relevant. Plaintiff also did not rely on the documents contained on the CD-rom in its summary judgment briefing. Any claim that the documents are relevant therefore is dubious at best. Accordingly, the Court will not compel Defendants to supplement the administrative record with the contents of the CD-rom.
C. The Viability of Plaintiff's Suit
Forest-wide management practices are generally not amenable to suit under the APA because they do not constitute final agency actions. Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1067 (9th Cir.2002). in Neighbors, however, the Ninth Circuit authorized a challenge to forest-wide management practices where those practices were alleged to render a site-specific, final agency action unlawful. Id. The plaintiffs in Neighbors alleged the Forest Service's failure to comply with NFMA's requirements for monitoring old growth habitat and species rendered its decision to authorize a project involving harvest of old growth arbitrary and capricious. Id. at 1068. The court permitted the suit to proceed because the plaintiffs established a relationship between the lawfulness of the project and the challenged forest-wide management practice. Id. at 1067-68.
To the extent Plaintiff attempts to challenge forest-wide management practices in the KNF on the coattails of the nine challenged logging projects, its suit is generally permitted. Where Plaintiff's action falters, however, is in establishing a connection between the challenged forest-wide management practices and the lawfulness of the logging projects. Plaintiff bears the burden of proving the Forest Service's approval of the nine challenged projects was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Wash. Crab Producers, Inc. v. Mosbacher, 924 F.2d 1438, 1441 (9th Cir.1990). As discussed more fully below, however, Plaintiffs briefs contain very few citations to the challenged projects or discussion of their impacts. It is very difficult for a district court to conduct the required searching and careful review of an agency's action when the party challenging that action fails to point to specific places in the record where the agency's analysis was deficient. This difficulty is highlighted in the instant case, where Plaintiff challenges nine projects whose cumulative administrative records encompass two DVDs.
Plaintiffs Complaint and briefing contains a laundry list of issues Plaintiff alleges the Forest Service did not consider in approving the challenged projects. In response, Defendants make repeated reference to the administrative record. These record citations largely demonstrate the issues identified by Plaintiff were considered by the Forest Service in approving the projects. Plaintiff, in reply, fails to explain how the cited portions of the record are inadequate to address the issues it raises. Moreover, in challenging forest-wide management practices, Plaintiff continually references deficiencies identified in the 1993 Draft Report. Plaintiff, however, offers little support for its contention that these deficiencies still exist. Plaintiff also fails to acknowledge that although the Forest Service no longer conducts formal five-year reviews, it has continued to monitor and evaluate resources in the KNF. See Supp. AR, Vol. 1, Does. 5-32 (containing monitoring reports from 1990 to 2004). Thus, although Plaintiffs suit is generally *1158 permitted, as discussed move fully below, Plaintiffs specific claims are without merit.
D. Forest Plan Amendments
NEPA requires EISs to consider the cumulative impact of the subject project together with past, present, and reasonably foreseeable future actions. Native Ecosystems Council v. Dombeck, 304 F.3d 886, 895 (9th Cir.2002). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, or reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (quotation omitted).
Plaintiff argues the Forest Service failed to consider the cumulative impact of continually adopting Forest Plan amendments for individual timber projects in the KNF. According to Plaintiff, the Forest Plan has been amended 67 times, and eight of the nine challenged projects require at least one amendment.
The Forest Plan authorizes project specific amendments. It provides:
If it is determined during project design that the best way to meet the management area goals of the Forest Plan conflicts with the Forest Plan standards, the Forest Supervisor may approve a variance to that standard for the project; such variances and the rationale for the changes must be described in the project's documentation and effected by means of a project specific amendment to the Forest Plan.
Supp. AR, Vol. 1, Doc. 01-001, at 224. Plaintiff does not explain how the site-specific amendments adopted for the challenged projects fail to satisfy the Forest Plan's requirements for amendment. Moreover, review of the administrative record reveals the Forest Service properly analyzed whether each of the amendments was the best way to meet the management area goals of the Forest Plan. See, e.g., AR Alder, Vol. 1, Doc. 3; AR Bristow, Vol. 1, Doc. 3; AR Cow Creek, Vol. 1, Doc. 3. In particular, for each amendment, the Forest Service discussed reasons for rejecting project alternatives that would not require the amendment. See, e.g., id. The Forest Service also explained its reasons for concluding each amendment would not significantly affect the Forest Plan. See, e.g., id. Therefore, the Forest Service's decision to adopt site-specific amendments for the challenged projects was not arbitrary and capricious.
Plaintiff also contends the Forest Service must consider the cumulative impact of continually adopting Forest Plan amendments. Plaintiff argues a project's EIS must disclose past site-specific amendments that have been adopted in the project area. Plaintiff, however, points to no prior amendments in the relevant project areas that were not considered. Moreover, the Forest Service maintains a tracking system for the purpose of considering the Forest-wide cumulative effects of Forest Plan amendments.
E. Water Quality and Aquatic Habitat
NFMA requires the Forest Service to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B). It also requires the Forest Service to "insure that timber will be harvested from National Forest System lands only where ... protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, *1159 and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat." 16 U.S.C. § 1604(g)(3)(E)(iii).
Plaintiff alleges the Forest Service has failed to adequately analyze the degradation of water quality and fish habitat that has resulted from continued logging and road construction in the KNF. Plaintiff points to the 1993 Draft Report, which indicates Forest Plan Monitoring Items F-2 and F-3, relating to water quality and fish habitat, were out of compliance with Forest Plan standards.[1] Plaintiff does not cite to more recent monitoring results. Nevertheless, these results indicate the monitoring items remain out of compliance. See Supp. AR, Vol. 1, Doc. 01-007, at 55, 62. The most recent monitoring report states "when projects are proposed in watersheds that are over the standard [for monitoring item F-3], they are designed to improve the long-term watershed condition, rescheduled, or dropped." Supp. AR, Vol. 1, Doc. 01-007, at 62. To ensure proposed projects improve watershed conditions, the report indicates water yield calculations and stream channel analysis should be conducted before projects are implemented. Supp. AR, Vol. 1, Doc. 01-007, at 62. Plaintiff does not argue water yield calculations and stream channel analysis were not conducted for the challenged projects. Nor does Plaintiff contend the projects were not designed to improve long-term watershed conditions. Moreover, a review of the challenged projects indicates the appropriate analyses were conducted. See, e.g., AR Bristow, Vol. 6, Doc. 7, at 8 (noting "[r]oad maintenance/reconstruction and stream restoration activities were designed specifically to improve conditions in terms of eliminating sediment sources and improving instream habitat conditions"); AR McSutten, Vol. 3, Doc. 188, at 6-7 (concluding no project alternatives would exceed recommended Forest Plan peak flow levels); see also Defendant-Intervenors' Reply Brief, at 6 (citing monitoring data for watersheds in challenged project areas).
Plaintiff also argues the Forest Service's reliance on Best Management Practices ("BMPs") to ensure water quality is unwarranted because BMPs have failed to adequately protect water quality in the past. In support of this assertion, Plaintiff cites a 1999 audit of BMPs which indicates the KNF "road system ... does not adequately protect water quality." Supp. AR, Vol. 1, Doc. 01-61, at 6. Plaintiff also notes that many of the watersheds in the challenged project areas do not meet Riparian Management Objectives. Plaintiff, however, provides no evidence that poor water quality in the KNF is the result of BMP implementation as opposed to practices that occurred prior to the introduction of BMPs. Moreover, the Forest Plan Monitoring and Evaluation Report for FY01 demonstrates BMPs are effective at protecting soil and water resources and beneficial uses. Supp. AR, Vol. 1, Doc. 01-007. Evaluation of thirty-five projects in FY01, including timber harvest and road construction and reconstruction projects, revealed BMPs were implemented correctly 96% of the time and were effective to an acceptable level 94% of the time. Supp. AR, Vol. 1, Doc. 01-007, at 39.
Plaintiff also contends the Forest Service has violated NFMA by failing to designate a species of fish as a management indicator species ("MIS"). Plaintiff argues *1160 36 C.F.R. § 219.19(a)(1) requires designation of a fish MIS. This regulation, however, has been repealed. Thus, the Forest Service is not obligated to designate a fish MIS.
Plaintiffs fish habitat concerns seem to center around the threatened bull trout. Plaintiffs Complaint, for example, alleges the challenged projects will adversely modify bull trout habitat. Although Plaintiffs claims under the Endangered Species Act ("ESA") have been dismissed, Plaintiff asserts protection of bull trout is required by NEPA and NFMA as well. Plaintiff, however, does not provide specific references to the challenged projects and explain how they will adversely affect bull trout. Moreover, it appears the Forest Service consulted with the U.S. Fish and Wildlife Service ("FWS"), when necessary, on impacts from the challenged projects on bull trout. See AR Cow Creek, Vol. 3a, Doc. 1, at 8 (noting bull trout do not occur in project area); AR Bristow, Vol. 6, Doc. 7, at 7 (concluding project would not affect bull trout); AR McSwede, Vol. 3, Doc. 92 (same); AR Lower Big Creek, Vol. 3, Doc. 91 (same); AR McSutten, Vol. 3, Doc. 188, at 6-7 (same); AR Fortine, Vol. 6, Doc. 331, at 5 (same); AR Pipestone, Vol. 12, Doc. 24 (containing FWS's Biological Opinion); AR West Troy, Vol. 33, Doc. 2 (containing FWS's comments on Forest Service's "may affect, not likely to adversely affect" determination for bull trout). Plaintiff does not specifically challenge any of these findings or conclusions.
F. Old Growth
None of the challenged projects appear to involve logging of designated Management Area 13 ("MA-13") old growth. See Defendant-Intervenors' Reply Brief, at 2-3. Nevertheless, the projects do require harvest of some undesignated replacement old growth, treatment of old growth, or otherwise affect old growth. See, e.g., AR McSutten, Vol. 2, Doc. 3, at III-157; AR Lower Big Creek, Vol. 2, Doc. 5, at III-2; AR West Troy, Vol. 34, Doc. 1, at III-50. As a result, Plaintiff has established a sufficient relationship between the challenged projects and forest-wide practices relating to managing old growth to permit it to contest the forest-wide management practices on the coattails of the challenged projects. See Neighbors, 303 F.3d at 1067-68.
The Forest Plan requires that a minimum of "10% of the [KNF] land base below 5,500 feet in elevation [] be in oldgrowth timber condition, providing habitat for those wildlife species dependent on old growth timber for their needs." Supp. AR, Vol. 1, Doc. 01-001, at II-22. Additionally, according to the Forest Plan, old growth must be "spread evenly through most major drainages, and will represent the major forest types in each drainage." Id.
Plaintiff does not appear to contend that the KNF, as a whole, or any of the challenged projects, individually, fail to satisfy the Forest Plan's old growth requirements. Instead, Plaintiff challenges the Forest Service's method of calculating and inventorying old growth. Plaintiff first argues the Forest Service cannot use replacement old growth in its efforts to achieve the minimum 10% old growth required by the Forest Plan. This argument, however, was rejected by this Court in Ecology Center, Inc. v. Castenada, CV-02-200-M, 2003 U.S. Dist. LEXIS 26446, *13 (D. Mont. June 27, 2003). Because 10% of the KNF was not in old growth condition when the Forest Plan was adopted, the Court determined in Ecology Center that "the Plan contemplated using old growth from adjacent third order drainages to boost the percentage for deficient neighboring drainages" and using "designated old growth that may include trees that are *1161 not yet technically old growth" (i.e., replacement old growth). Id.
Plaintiff also argues the Forest Service has failed to establish objective criteria for designating effective and replacement old growth and that maps displaying the distribution of old growth throughout the KNF are not linked to underlying data indicating how each area of old growth meets the relevant criteria. Plaintiff's contention is without merit. The Forest Service has adopted the old growth definitions contained in "Old-Growth Forest Types of the Northern Region" (Green, et al.1992) for designating old growth habitat. Supp. AR, Vol. 1, Doc. 01-45. These definitions divide old growth into various types based on certain minimum, objective characteristics. See Supp. AR, Vol. 1, Doc. 01-45, at 13-42. Moreover, the Forest Service utilized these type designations in identifying old growth in areas affected by the challenged projects. See, e.g., AR McSutten, Vol. 2, Doc. 3, at III-157 (indicating Green's type of old growth located in each unit to be treated during implementation of the project).
Plaintiff also challenges the extreme fragmentation of old growth habitat in the KNF. According to Plaintiff, the Forest Service has persistently ignored the minimum patch size requirement of 50 acres when designating and calculating old growth. Moreover, Plaintiff notes, Forest Service monitoring does not indicate the amount of effective old growth in the KNF that is in block sizes less than 50 acres, less than 80 acres, and less than 100 acres. The Forest Plan, however, does not require a minimum patch size of 50 acres before habitat can be designated as old growth. The document cited by Plaintiff, "Old Growth Habitat Characteristics and Management Guidelines," merely provides recommendations for old growth management. According to these recommendations,
[U]nits of 50-100 acres [of old growth] are the smallest acceptable size in view of the nesting needs of pileated woodpeckers .... [W]hile units of a minimum of 50 acres may be acceptable in some circumstances, 50 acres should be the exception rather than the rule. ... If, due to past fires or management activities, the only remaining old growth blocks are less than 50 acres, they may still be useful habitat provided that several small blocks are clustered together or are surrounded by mature timber. Isolated blocks of old growth which are less than 50 acres and surrounded by young stands contribute very little to the long-term maintenance of most old growth dependent wildlife species [because they offer limited opportunity for genetic exchange between breeding, old growth dependent species with short dispersal distances].
Supp. AR, Vol. 1, Doc. 01-003, at 9-10. Therefore, contrary to Plaintiff's assertion, the Forest Service is not limited to designating only patch sizes of 50 acres or more as old growth; rather, such a practice is merely recommended when possible.
Finally, Plaintiff questions the Forest Service's use of the pileated woodpecker as the MIS for insuring the viability of other old growth dependent species. Plaintiff contends the pileated woodpecker's disproportionate reliance on snag habitat renders it an invalid proxy for old growth species that depend on other aspects of old growth habitat such as live trees and multiple canopy. Plaintiff made a similar challenge to the use of the pileated woodpecker as the MIS for old growth habitat in Ecology Center, CV-02-200-M, 2003 U.S. Dist. LEXIS 26446. This Court rejected Plaintiff s argument at that time concluding the Forest Service's decision to designate the pileated woodpecker as the MIS was based on valid science and thus entitled to deference. Id. at *18. Plaintiff offers no new *1162 scientific evidence in the instant action to suggest deference to the Forest Service's determination is no longer warranted. Additionally, the research relied on by the Forest Service in selecting the pileated woodpecker as the MIS for old growth directly contradicts Plaintiffs assertion that the pileated woodpecker relies disproportionately upon snag habitat. The research indicates pileated woodpecker "cannot be accommodated by simply leaving snags in areas otherwise clearcut." Relationships Between Hole-Nesting Birds, Forest Snags, and Decay in Western Larch  Douglas-Fir Forests of the Northern Rocky Mountains (B. Riley McClelland, 1977), AR Fortine, Vol. 15, Doc. 703, at 90.
G. Soil and Noxious Weeds
NFMA requires the Forest Service to "insure that timber will be harvested from National Forest System lands only where ... soil, slope, or other watershed conditions will not be irreversibly damaged." To comply with NFMA, the KNF relies on Regional Soil Quality Standards that prohibit "detrimental soil conditions on more than 15% of an activity area." Citing the 1993 Draft Report, Plaintiff claims the Forest Service is not meeting Regional Soil Quality Standards. Plaintiff further argues the Forest Service's failure to monitor soils after the 1993 Draft Report was released renders its determination that the challenged projects will not significantly impact soil quality arbitrary and capricious.
The 1993 Draft Report showed that 49% of the 501 transected-acres surveyed were above the Forest Plan limit of 15% detrimental disturbance. Since that time, however, the Forest Service has continued to conduct field monitoring on soils. This monitoring indicates conditions have improved since 1993. See generally Forest Plan Monitoring and Evaluation Report FY02, Supp. AR, Vol. 1, Doc. 01-005, at 51-54. From 1993 to 1997, the Forest Service monitored 138 units within 69 sales. Id. at 53. Only 1% (21 acres) was beyond Forest Plan limits. Id. During the most recent five-year monitoring period (1998-2002), the Forest Service monitored 136 units within 72 sales. Id. Activities occurring in the project areas monitored include skyline/cable logging, forwarder logging, tractor logging, and horse logging. Id. at 51. Of the 2,417 acres monitored, none were determined to be beyond the 15% detrimental disturbance level. Id. Thus, Plaintiffs claims that the Forest Service has failed to monitor soils and that soils in the KNF do not meet Regional Soil Quality Standards are not supported by the record.
Plaintiff does not point to any specific deficiencies in the Forest Service's soils analysis for any of the challenged projects. In any event, a review of the challenged projects indicates the Forest Service took the requisite "hard look" at soils. See, e.g., AR Bristow, Vol. 1, Doc. 02-001, at 101-02 (indicating existing soil disturbance level in units of project area where previous harvests occurred and estimating cumulative impact from past and present harvests to be below 15% soil disturbance); AR South McSwede, Vol. 2, Doc. 62, at 121-122 (same).
Plaintiff also claims the Forest Service has failed to adequately address the spread of noxious weeds associated with logging. Once again, Plaintiff cites to the 1993 Draft Report. Prior to 1997, weeds in the KNF were controlled primarily using biological and cultural controls. Forest Plan Monitoring and Evaluation Report FY03-04, Supp. AR, Vol. 1, Doc. 32, at 32. These methods were largely ineffective. Id. at 31. In 1996, a Noxious Weed Control Provision was added to timber sale contracts. Id. at 32. The provision requires all off-road equipment to be *1163 washed prior to operating. In 1997, the Forest Service began spraying herbicides to control noxious weeds on a large scale.[2]Id. at 28. In the summers of 2003 and 2004, the Forest Service conducted 429 weed surveys. Id at 26. Although monitoring of these samples reveals noxious weeds have increased in number, variety, and density since 1987, the Forest Service is working on an updated approach to noxious weed management across the KNF. Id. at 32. It thus appears the Forest Service is addressing the problem of noxious weeds. Moreover, as with soils, Plaintiff does not point to any specific deficiencies in the Forest Service's analysis of noxious weeds for the challenged projects, and a review of the projects' EISs reveals the Forest Service took the requisite "hard look" at noxious weeds. See, e.g., A..R Alder, Vol. 1, Doc. 02-004, at 205-216 (indicating noxious weed species present in the project area, past and future weed control measures, and cumulative impacts of past activities on noxious weeds); AR Pipestone, Vol. 5, Doc. 1, at 115-117 (identifying noxious weed species present in the project area and past and future weed control measures).

IV. Conclusion
Accordingly, IT IS HEREBY ORDERED that Plaintiffs Motion to Supplement the Record (dkt # 40) is GRANTED IN PART and DENIED IN PART. The materials identified in paragraph numbers 1 through 5 of Plaintiffs motion to supplement will be added to the record. The Court will not compel the Forest Service to supplement the administrative record with the materials identified in paragraph number 6 of Plaintiffs motion to supplement.
IT IS FURTHER ORDERED that Defendants' Motion to Strike Plaintiffs Supplemental Administrative Record (dkt # 47) is DENIED.
IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (dkt # 52) is GRANTED. Plaintiffs Motion for Summary Judgment (dkt # 38) is DENIED. Defendant-Intervenors' Motion for Summary Judgment (dkt # 45) is DENIED.
NOTES
[1] Monitoring Item F-2 requires measurement of bedload, suspended sediment, and streamflow on seven drainages to document protection of fishery habitat. See Supp. AR, Vol. 1, Doc. 01-007, at 53-59. Monitoring Item F-3 tracks changes in Stream Channel Stability and peak flow. Id. at 60-63.
[2] The KNF completed an Herbicide Weed Control Environmental Assessment in 1997 and has initiated the process for a forest-wide EIS for ground and aerial herbicide application. Supp. AR, Vol. 1, Doc. 32, at 28.