**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Petitioner, <br><br> v. <br><br> UNITED STATES BUREAU OF LAND MANAGEMENT; U.S. FISH AND WILDLIFE SERVICE, <br><br> Respondents, <br><br> RUBY PIPELINE, L.L.C., <br><br> Respondent-Intervenor. | No. 10-72356 <br><br> MEMORANDUM[*] |
| COALITION OF LOCAL GOVERNMENTS, ON BEHALF OF ITS MEMBERS, INCLUDING LINCOLN COUNTY, WYOMING, <br><br> Petitioner, <br><br> v. | No. 10-72552 |

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

BUREAU OF LAND MANAGEMENT;
DEPARTMENT OF THE INTERIOR,

Respondents,

RUBY PIPELINE, L.L.C.,

Respondent-Intervenor.

WARNER BARLESE, Member, Summit Lake Paiute Tribe, Nevada, and Chairman, Summit Lake Paiute Council,

Petitioner,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT; U.S. ARMY CORP OF ENGINEERS; U.S. FISH AND WILDLIFE SERVICE,

Respondents,

RUBY PIPELINE, L.L.C.,

Respondent-Intervenor.

No. 10-72762

IBLM Nos.  NVN-084650
           OR-64807
           UTU-82880
           WYW-171168

(W0350)

FORT BIDWELL INDIAN COMMUNITY OF THE FORT BIDWELL INDIAN RESERVATION OF CALIFORNIA,

Petitioner,

No. 10-72768

v.

UNITED STATES BUREAU OF LAND
MANAGEMENT; U.S. FISH AND
WILDLIFE SERVICE; UNITED STATES
ARMY CORPS OF ENGINEERS,

Respondents,

RUBY PIPELINE, L.L.C.,

Respondent-Intervenor.

DEFENDERS OF WILDLIFE; SIERRA
CLUB; GREAT BASIN RESOURCE
WATCH,

Petitioners,

RUBY PIPELINE, L.L.C.,

Intervenor,

v.

UNITED STATES BUREAU OF LAND
MANAGEMENT; UNITED STATES
ARMY CORPS OF ENGINEERS; U.S.
FISH AND WILDLIFE SERVICE,

Respondents.

No. 10-72775

IBLM No. CP09-54-000

On Petition for Review of an Order of the

3

Bureau of Land Management, Fish and Wildlife Service, and Army Corps of Engineers

Argued and Submitted October 11, 2011
Portland, Oregon

Before: BERZON and N.R. SMITH, Circuit Judges, and SMITH, District Judge.[**]

The Center for Biological Diversity ("CBD"),[1] Coalition for Local Governments ("CLG"), Fort Bidwell Indian Community ("Bidwell Tribe"), and Summit Lake Paiute Tribe ("Paiute Tribe") filed a Petition for Review challenging the Bureau of Land Management's ("BLM") Record of Decision ("ROD") and the Army Corps of Engineers's ("Corps") Nationwide Permit ("NWP") authorization for the Ruby Pipeline Project ("pipeline" or "project").[2]

## 1. National Environmental Policy Act ("NEPA")

### a.

Whether the Final Environmental Impact Statement (FEIS) failed to "rigorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R

[**] The Honorable William E. Smith, District Judge for the U.S. District Court for the District of Rhode Island, sitting by designation.

[1] CBD filed joint briefs with the Defenders of Wildlife, et al. We use the acronym "CBD" to refer to both parties collectively.

[2] CBD and the Paiute Tribe also raised claims under the Endangered Species Act challenging the Fish and Wildlife Service's Biological Opinion, on which BLM partially based its ROD. We address those claims in a separate opinion issued concurrently with this memorandum disposition.

§ 1502.14(a), to the proposed route is moot. The pipeline is now complete, and neither CBD nor the Bidwell Tribe seek to shift it, in whole or in part, to an alternative route. At this point, an analysis of alternatives would no longer inform decision-making regarding the pipeline's location. Accordingly, no effective relief is available for these claims, and they are moot. *See Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244-45 (9th Cir. 1988).

**b.**

Whether the FEIS fell short of NEPA's requirements by failing adequately to analyze the project's impacts on the Paiute Tribe's cultural resources is also moot. The pipeline was subsequently re-routed away from the cultural resources the Tribe says BLM failed to study.

**c.**

In contrast, whether BLM failed to conduct a proper cumulative effects analysis is not moot. An appropriate FEIS could still yield effective post-construction relief in the form of mitigation. *See Or. Natural Res. Council v. BLM*, 470 F.3d 818, 821 (9th Cir. 2006).

The FEIS does not provide sufficient "quantified or detailed data," *Ecology Center v. Castaneda*, 574 F.3d 652, 666 (9th Cir. 2009), about the cumulative loss of sagebrush steppe vegetation and habitat. *See also Lands Council v. Powell*, 395

5

F.3d 1019, 1028 (9th Cir. 2005). With respect to past impacts, the FEIS provides no information on how much acreage sagebrush vegetation used to occupy, or what percentage of that has been destroyed by previous actions like grazing,[3] which makes it impossible to gauge the *cumulative* impact of destroying another 9,224.8 acres, as the pipeline is projected to do. *See Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994 n.1 (9th Cir. 2004). In addition, the FEIS concludes that "[t]he additive effects of present and future projects would continue a trend toward a reduction in [sagebrush and other] vegetative communities," but does not quantify or otherwise specify what those effects would be. The FEIS's assertion constitutes the type of "generalized conclusory statement," *Klamath-Siskiyou*, 387 F.3d at 996, that this Court has found insufficient in cumulative effects analyses.

---

[3] Reasoning that "grazing is considered part of the ecological regime" and "not a project or projects," the FEIS omits the past impacts of grazing from its cumulative effects analysis. However, the FEIS also recognizes that grazing "has occurred in the project area," and is "highly destructive" to sagebrush habitat. Grazing thus constitutes a "relevant prior . . . action[]," *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 667 (9th Cir. 2009), whose impacts cannot be omitted from the cumulative effects analysis. *See also* 40 C.F.R. § 1508.7.

*Compare League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1136 (9th Cir. 2010).[4]

The necessity of a thorough cumulative effects analysis with respect to sagebrush is underscored by the FEIS's recognition that "project impacts on sagebrush steppe vegetation would be significant" because a "substantial amount of sagebrush steppe habitat would be removed during construction." The FEIS also acknowledged that "[i]mpacts on the sagebrush steppe community, which is the most dominant vegetation community crossed by the project, would be long-term or permanent because this vegetation type could take as long as 50 years or more to return to preconstruction conditions." The FEIS's cumulative impact analysis thus falls short of what NEPA requires.

**d.**

Although not moot, *see Or. Natural Res. Council*, 470 F.3d at 821, the Petitioners' final NEPA claim lacks merit.

The FEIS omits data on "water body flow and width at crossing[s]" for some bodies of water. But it establishes that most bodies of water crossed by the

---

[4] Despite the federal respondents' assurance in their brief that "[p]ast mining impacts on sagebrush habitat and wildlife is subsumed in the discussion of those resources," it is unclear from the FEIS itself whether mining numbers among the "other activities," identified in the FEIS as having contributed to the cumulative loss of sagebrush vegetation.

pipeline are "intermittent drainages and washes [] that are expected to be dry at the time of construction," and that none of these contain "prevalent sensitive fish species" or implicate "sensitive fisheries" issues, including "[r]isk of sedimentation [to] downstream [] protected species." The FEIS thus adequately considers the impacts of the project's water crossings.

## 2. National Historic Preservation Act ("NHPA")

### a.

The BLM engaged in adequate "government-to-government" consultation with the Paiute Tribe in a timely manner, as required by the regulations implementing section 106 of the NHPA. 36 C.F.R. §§ 800.2(c)(2); 800.1(c). The Tribe received communications starting in March 2008 concerning the project. And even assuming that government-to-government consultation did not begin until the February 2009 meeting, the record shows that alternate routes were still being considered at that time. In fact, the Sheldon route, which would have avoided the Tribe's traditional cultural property altogether, was analyzed extensively in the January 2010 final environmental impact statement. BLM therefore met its obligation to engage in timely, good faith consultation under the

8

NHPA.  *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 806–07 (9th Cir. 1999).[3]

**b.**

BLM did not violate the NHPA by failing to "designate a lead Federal agency" responsible for consultation.  36 C.F.R. § 800.2(a).  While the regulations do make clear that one agency official must retain "legal and financial responsibility for section 106 compliance," 36 C.F.R. § 800.2(a), they also explicitly condone using "the services of applicants, consultants, or designees to prepare information," 36 C.F.R. § 800.2(a)(3).  The regulations nowhere require that all consultation be conducted by a single official, and in fact contemplate just the type of multi-party approach used here.  *Cf. Te-Moak Tribe of Western Shoshone v. Dep't of Interior*, 608 F.3d 592, 609–10 (9th Cir. 2010).

**c.**

Nor did BLM fail to mitigate the harm to the Bidwell Tribe's traditional cultural property.  The NHPA, like NEPA, is a procedural statute; it does not mandate substantive outcomes.  *See San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005).  BLM therefore satisfied its obligations under the

---

[3]BLM did not fail to comply with the *Guidelines for Conducting Tribal Consultation*, BLM Manual, H-8120-1.  The overall consultation process included the various types of consultation mandated by the Guidelines.

NHPA by considering, in the memoranda of agreement that concluded the section 106 process, measures that would mitigate harm to the traditional cultural property and adopting some of them.

**d.**

Finally, BLM did not violate the section 106 regulations by adopting a phased approach to identifying historic properties. Where routing is at issue, agencies may continue to defer "final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement." 36 C.F.R. § 800.4(b)(2). The memoranda of agreement for Nevada and Oregon both provide for a phased approach, as permitted by the regulations. The ROD made clear that construction was not to begin until the memoranda were executed, and the first notice to proceed allowing construction was not in fact issued until after that. The phased approach therefore proceeded exactly as contemplated by the regulations.

**3. Clean Water Act ("CWA")**

**a.**

The Corps did not act arbitrarily and capriciously by authorizing the pipeline under NWP 12 rather than requiring an individual permit. Under NWP 12, the permittee must submit a written pre-construction notification, 33 C.F.R. § 330.1(e),

which allows a Corps District Engineer to "review the proposed activity," 33 C.F.R. § 330.1(d), and consult with the permittee, at which point the permittee may "furnish information which satisfies the [District Engineer's] concerns." 33 C.F.R. § 330.5(d)(2).

The Corps was initially concerned that Ruby's proposed crossing of Goose Lake would be ineligible for NWP 12 and would thus require an individual permit, but subsequently decided to authorize the entire project, including Goose Lake, under NWP 12. Once the Corps exercises its discretion to decide that a project requires an individual permit, it may "restore authorization under the NWPs" if it "determines that [the] reason for asserting discretionary authority has been satisfied by a condition, project modification, or new information." 36 C.F.R. § 330.4(e)(3). That is what happened here: Ruby modified its crossing of Goose Lake in response to the Corps' early concerns, and specific modifications and mitigation measures were adopted in the Corps' statement of findings in support of its decision to authorize the project under NWP 12. The regulatory requirements were thus satisfied.

**b.**

The project met NWP 12's general conditions 3, 15, and 20. General Condition 3 provides that "activities in spawning areas during spawning seasons

11

must be avoided to the maximum extent practicable" and that "physical destruction of an important spawning area [is] not authorized." 72 Fed. Reg. at 11,191. The Corps, after evaluating each of the pipeline's over 1,000 stream crossings, ensured that General Condition 3 was met.

General Condition 15 forbids any activity "in a component of the National Wild and Scenic River System, or in a river officially designated by Congress as a 'study river' for possible inclusion in the system." 72 Fed. Reg. 11,192. While Twelvemile Creek in Oregon had been proposed for designation as a Wild and Scenic River, it was not officially designated by Congress as a "study river."

General condition 20 requires "compensatory mitigation at a one-for-one ratio . . . for all wetland losses that exceed 1/10 acre." 72 Fed. Reg. 11,193. To constitute a loss within the meaning of General Condition 20, the fill must "change an aquatic area to dry land." 72 Fed. Reg. 11,196. Nothing in the record establishes that such a "loss" will occur. At worst, .183 acres of wetlands of one type will be converted into wetlands of another type. There was thus no violation of General Condition 20.

**c.**

Finally, the Corps reasonably determined that the project would have "only minimal individual and cumulative environmental impacts," 33 C.F.R §

12

323.2(h)(1).  Using data provided by Ruby, the Corps analyzed both the individual and cumulative impacts.  It then made the required "reasoned predictions" that these impacts would be minimal and the project would therefore qualify for NWP 12.  *See Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005).

### 4.  Federal Land Policy and Management Act ("FLPMA")

The Bidwell Tribe contends that the route chosen caused "unnecessary or undue," 43 U.S.C. § 1732(b), destruction of cultural properties and sagebrush habitat, but has not identified any "*discrete* agency action that [BLM] is *required to take*" but did not.  The Tribe's FLPMA claim therefore fails.  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004); *see Gardner v. BLM*, 638 F.3d 1217, 1222 (9th Cir. 2011); *Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir. 2006).

### 5.  Standing

The Coalition lacks standing to bring its NEPA challenge.  There is no evidence in the record indicating that Ruby's agreement with the Western Watersheds Project ("WWP") to fund the purchase and relinquishment of grazing permits was contingent on completion of the pipeline.  Instead, the agreement appears to have been conditioned upon withdrawal of WWP's efforts "to litigate or seek delay in the construction of the Ruby pipeline."  The causal link between

13

BLM's approval of the pipeline and the potential relinquishment of grazing permits is too attenuated to support standing. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

***

We **GRANT** the petition for review with respect to Section 1.c of this memorandum disposition and **REMAND** to BLM to undertake a revised cumulative effects analysis that comports with NEPA. We **DENY** the petition with respect to all remaining claims addressed herein.