# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EARTH ISLAND INSTITUTE, a non-
profit organization,
            *Plaintiff-Appellant,*

v.

ALICE B. CARLTON, in her official
capacity as Forest Supervisor for
Plumas National Forest; RANDY
MOORE, in his official capacity as
Regional Forester for Region 5 of
the United States Forest Service;
UNITED STATES FOREST SERVICE,
            *Defendants-Appellees.*

No. 09-16914

D.C. No.
2:09-cv-02020-FCD-
EFB
Eastern District of
California,
Sacramento

OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, Senior District Judge, Presiding

Argued and Submitted
March 10, 2010—San Francisco, California

Filed November 8, 2010

Before: Procter Hug, Jr., Stephen Reinhardt and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Hug;
Dissent by Judge Reinhardt

## COUNSEL

Rachel M. Fazio, Cedar Ridge, California, for the appellant.

David C. Shilton, Attorney, U.S. Department of Justice, Washington, D.C., for the appellees.

## OPINION

HUG, Circuit Judge:

Earth Island Institute ("Earth Island") appeals interlocutorily the district court's order denying its motion for a preliminary injunction seeking to enjoin the United States Forest Service ("Forest Service") from conducting post-wildfire logging in the Plumas National Forest. The district court concluded that the applicable forest plan required only the assessment of habitat for the black-backed woodpecker

("woodpecker") at the project level, that the Forest Service met that requirement, that the Forest Service adequately responded to Earth Island's dissenting scientific opinions in the project adoption phases, and that the Forest Service's tree mortality guidelines were not legally enforceable. We affirm.

## I.  FACTUAL BACKGROUND

In the summer of 2007, the "Moonlight" and "Wheeler" fires burned a total of 88,000 acres of private and National Forest land in the northern Sierra Nevadas in California. Approximately 78% of the fire took place within the Plumas National Forest. The rest was on private land.

Shortly after the fires, the Forest Service initiated the Moonlight-Wheeler Project ("project") to remove burned trees posing a safety hazard to road traffic within the project area ("roadside hazard trees"), to recover the value of fire-killed trees, and to reestablish the forest through the planting of conifer seedlings.

It is undisputed that forests burned at high intensity form a new type of ecologically rich ecosystem. This case concerns a subset of such an ecosystem, namely so-called "snag forest habitat." Snag forest habitat is important to several species of plants and animals. One of the species that depends on snag forest habitat is the black-backed woodpecker; a management indicator species ("MIS")[1] for the Sierra Nevada area. The woodpecker can only use snag forest habitat for up to a decade after a high-intensity fire at which point in time the forest will have changed naturally and the woodpecker must seek out new suitable habitat. According to a Plumas National Forest district ranger, snag forest habitat is extremely scarce

---

[1]An MIS is a species chosen by the Forest Service to represent a much larger group of native species with similar habitat requirements for environmental assessment purposes. *See Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1173 (9th Cir. 2006).

in the Sierra Nevadas due to fire suppression and post-fire logging.

Some dispute exists as to exactly how much of the woodpecker habitat in the Plumas National Forest would be destroyed by the project. Earth Island's experts conservatively estimate that at least 40-60% of the woodpecker's habitat within the project area would be destroyed, corresponding to 30-50% of woodpecker habitat throughout the entire Sierra Nevada. According to Earth Island, this could threaten the woodpecker's ability to survive in the Sierra Nevadas. In contrast, the Forest Service asserts that logging would only be conducted on approximately 22-27% of the forest burned on public land, thus leaving as much as 73% unlogged. However, the Forest Service also acknowledges that approximately 38% of the habitat that was *created* by the two fires on public land would be destroyed, but points out that to compensate for this, snag habitat has been designated on approximately 10% of the project area with no logging to take place there.

## II. PROCEDURAL BACKGROUND

Initially, the Forest Service proposed a separate project that would result in the logging of roadside hazard trees only. After Earth Island brought a challenge to that, the parties settled. The settlement provided that the Forest Service would re-evaluate that project as part of an Environmental Impact Statement ("EIS") then underway for non-hazard tree logging.

The Forest Service subsequently issued a Draft Revised EIS covering both roadside hazard and other trees. Earth Island submitted extensive timely comments on the draft. The Forest Service subsequently issued a Revised Final EIS ("RFEIS") analyzing five alternatives. Half a year later, the Chief of the Forest Service issued an Emergency Situation Determination allowing the Forest Service to implement the project as soon as a Record of Decision ("ROD") was signed. The Chief found this to be warranted given the threats to pub-

lic and employee safety and the fact that any delay in the implementation of the project would result in substantial loss of economic value and jeopardize other restoration and recovery objectives.

Soon thereafter, the Forest Service signed the ROD for the project, choosing alternative A. This authorized the harvest of fire-killed trees on approximately 14,755 acres of the approximately 41,000 acres of high severity burn areas using both ground- and air-based harvesting methods. The Forest Service subsequently awarded five logging contracts to local companies.

Subsequently, Earth Island filed a motion for a preliminary injunction seeking to enjoin the Forest Service from implementing all aspects of the project, including the felling, removal and sale of any trees apart from under emergency hazard circumstances. The district court denied Earth Island's motion. This appeal followed.

## III.   STANDARD OF REVIEW AND JURISDICTION

We have jurisdiction to review a district court's denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1). We review the denial of a preliminary injunction for abuse of discretion. *Earth Island Inst. v. U.S. Forest Serv. (Earth Island Inst. II)*, 442 F.3d 1147, 1156 (9th Cir. 2006). A district court abuses its discretion in denying a request for a preliminary injunction if it bases its decision on an erroneous legal standard or clearly erroneous findings of fact. *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc). A district court's decision regarding preliminary injunctive relief is subject to "limited and deferential" review. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). Accordingly, "[a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different

result if it had applied the law to the facts of the case." *Earth Island II*, 442 F.3d at 1156.

In deciding whether Earth Island is likely to succeed on the merits of its motion for a preliminary injunction, the APA sets forth additional requirements for review. *McNair*, 537 F.3d at 987. The APA states, in relevant part, that a reviewing court may set aside only agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*, citing 5 U.S.C. § 706(2)(A). Review under this standard is also narrow, and we may not substitute our judgment for that of the agency. *Id.* Rather, a decision may only be reversed as arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Thus, although the district court's denial of Earth Island's request for a preliminary injunction must be reviewed for an abuse of discretion, our review of the district court's determination as to whether Earth Island was likely to prevail on the merits of its claims necessarily incorporates the APA's arbitrary and capricious standard. *Id.*

## IV.  DISCUSSION

**[1]** A party seeking a preliminary injunction must demonstrate (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council,* 129 S. Ct. 365, 374 (2008). An injunction is a matter of equitable discretion" and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 376, 381.

Earth Island argues that the district court improperly assessed Earth Island's likelihood of success on the merits, applied an erroneous standard for the likelihood of irreparable harm, and incorrectly balanced the equities.

### A.   Likelihood of Success on the Merits

First, Earth Island contends that the district court imposed an unreasonably high standard for success on the merits. In doing so, Earth Island relies on the district court's statement that after *Winter*, "a heavy burden is imposed on plaintiffs." Earth Island argues that this means that the district court required more indicia of success on the merits than did *Winter*.

**[2]** The district court's statement forms part of a footnote and appears to simply be dictum. At any rate, as *Winter* plainly demonstrates, it is correct that plaintiffs seeking a preliminary injunction face a difficult task in proving that they are entitled to this "extraordinary remedy." 129 S. Ct. at 376. Characterizing this as a "heavy burden" was not improper and does not show that the district court applied an erroneous standard. Quite the contrary: the record shows that the district court correctly applied *Winter's* four-prong analysis throughout its thoroughly reasoned opinion.

Next, Earth Island contends that it is likely to succeed on the merits of its claims because (1) the Forest Service failed to ensure the viability of the woodpecker and thus violated the National Forest Management Act ("NFMA"); (2) the Forest Service's RFEIS failed to respond sufficiently to comments made by Earth Island's scientists; and (3) the Forest Service failed to follow its allegedly binding tree marking guidelines.

### i.   Purported species viability requirements

**[3]** As we stated in *Ecology Center v. Castaneda*,

> The National Forest Management Act . . . provides both procedural and substantive requirements. Procedurally, it requires the Forest Service to develop and maintain forest resource management plans. After a forest plan is developed, all subsequent agency action . . . must comply with NFMA and the governing forest plan. Substantively, NFMA requires that forest plans "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area."

574 F.3d 652, 656 (9th Cir. 2009) (citations omitted). However, we also explained that the Forest Service's "1982 rule" which required the Forest Service manage fish and wildlife habitat "to maintain viable populations of existing native and desired non-native vertebrate species" was partially superceded in 2000 (the "2000 Rule"). *Id.* at 657. As we stated, "[t]he requirements of the superceded 1982 Rule apply *only to the extent they were incorporated into the Forest Plan.*" *Id.* at 657. (emphasis added).

**[4]** Similarly, in *McNair*, we stated that "[t]he NFMA unquestionably requires the Forest Service to provide for diversity of plant and animal communities . . . in order to meet overall multiple-use objectives." 537 F.3d at 992 (quotation marks omitted). But emphasizing the "inherent flexibility of the NFMA", we pointed out that the NFMA does not "specify precisely how" the Forest Service must demonstrate that it has met the objectives of the pertinent forest plan. *Id.* As we said,

> as non-scientists, we decline to impose bright-line rules on the Forest Service regarding particular means that it must take in every case to show us that it has met the NFMA's requirements. Rather, we hold that the Forest Service must support its conclusions that a project meets the requirements of the NFMA and relevant Forest Plan with studies *that the*

*agency, in its expertise, deems reliable.* The Forest
Service must explain the conclusions it has drawn
from its chosen methodology, and the reasons it con-
siders the underlying evidence to be reliable. *We will
conclude that the Forest Service acts arbitrarily and
capriciously only when the record plainly demon-
strates that the Forest Service made a clear error in
judgment in concluding that a project meets the
requirements of the NFMA and relevant Forest Plan.*

*Id.* at 993-94 (emphasis added). In contrast to the case at
hand, the Forest Plan at issue in *McNair* contained specific
provisions regarding wildlife viability. *Id.* at 989 ("The . . .
Forest Plan requires the Forest Service to manage the habitat
of species listed in the Regional Sensitive Species List to pre-
vent further declines in populations which could lead to fed-
eral listing under the Endangered Species Act.") (alteration
and quotation marks omitted). Even so, "neither the NFMA
nor the . . . Forest Plan require the Forest Service to *improve*
a species' habitat to prove that it is maintaining wildlife via-
bility." *Id.* at 995. Further,

> Congress has consistently acknowledged that the
> Forest Service must balance competing demands in
> managing National Forest System lands. Indeed, . . .
> it has never been the case that the national forests
> were to be set aside for non-use . . . Congress' cur-
> rent vision of national forest uses . . . states that it is
> the policy of the Congress that the national forests
> are established and shall be administered for outdoor
> recreation, range, *timber*, watershed, *and wildlife* and
> fish purposes.

*Id.* at 990 (emphasis added, alteration, citations and quotation
marks omitted).

Here, the Plumas National Forest Plan was amended in
2004 and 2007. Earth Island cites to language in the 2004

amendment indicating that the forest management approach chosen "will provide the fish and wildlife habitat and other ecological conditions necessary to maintain well-distributed viable populations of vertebrate species in the planning area, and maintain the diversity of plants and animals." Earth Island contends that this shows that the Forest Service was to ensure the viability of the woodpecker. This statement does not clearly stand for this proposition. First, it could be read to mean that the Service was to ensure the *distribution* of the species, especially when read in combination with the most recent amendment which also calls for distribution, but not viability analyses. Second, the requirement pertains to the planning area, not the project area at issue in this case. As shown below, the Forest Service did, in fact, find that there would be no change in the distribution of the woodpeckers at the Sierra Nevada level. Similarly, the 2007 amendment only requires "*[d]istribution* population monitoring [to] track changes in the distribution of each MIS *at the Sierra Nevada scale* by monitoring the changes in the presence of the species across a number of sample locations," but "[t]he sole MIS requirement that is applied at the *project-level* is the *assessment of habitat for MIS*. Further, there are *no monitoring requirements for MIS at the project level*." (Emphasis added).

**[5]** The record shows that the Forest Service satisfied the requirement to assess MIS habitat in the project area. For example, in the Management Indicator Species Report for the Moonlight-Wheeler project, the Forest Service acknowledged the importance of snag forest to the woodpecker, estimated post-fire snag forest density in the proposed project area, analyzed the direct, indirect and cumulative effects of logging on the habitat under the five proposed alternatives. The Forest Service concluded that "[a]ll action alternatives, combined with ongoing and planned fire-killed tree removal projects, leave more area unharvested than harvested within the analysis area. . . . Leaving the majority of the burn in an unharvested condition maintains an important component of biological diversity [for] all the unique plants and animals that

depend on those first few years of natural (postfire) succession. This includes the [woodpecker]." The RFEIS similarly analyzed the effects of the proposed project on the woodpecker's habitat needs at the project level in a thorough manner. As the district court noted,

> the [Forest Service] analyzed the amount of suitable habitat that would be lost in the analysis area due to salvage logging, and concluded that 62% of suitable habitat created by the Moonlight and Wheeler fires, or 20,172 acres, would remain untreated, and thus still support an upward trend in BBWO [black-backed woodpecker] population. Finally, the [Forest Service] also analyzed the relationship of the project-level habitat impacts to the bioregional BBWO population trends and determined that after Project implementation, there would still be sufficient acres of forested areas that burned at high severity to support BBWO suitable habitat.

**[6]** Further, the district court correctly found that the species distribution requirements only applied to the greater Sierra Nevada bioregional level, but not to the specific project at issue here. The district court correctly found that the Forest Service had analyzed the population distribution data in sufficient detail, concluding that the project would preserve a sufficient area to support the woodpeckers.

**[7]** We give great deference to agencies when faced with this type of scientific evidence. *See, e.g., Castaneda*, 574 F.3d at 664; *McNair,* 537 F.3d at 993. Although we relied on species viability requirements in, for example, *McNair*, 537 F.3d at 992, 998, we emphasize the fact that such requirements only apply when contained in the pertinent forest plan for the site-specific area. *Id.* at 992, 994-95. This was not the case here. Earth Island also relies on the 1983 version of 36 C.F.R. § 219.19 as standing for the proposition that species viability was required. But as we said in *McNair*, "[s]ection 219.19

required the Forest Service to manage wildlife habitat 'to maintain viable populations of existing . . . species' and required the Forest Service to designate management indicator species (MIS) to monitor and evaluate wildlife viability. *This regulation is no longer in effect*." 537 F.3d at 989 n.5 (emphasis added, citation omitted). Here, in explaining how the 2007 Plumas National Forest Plan Amendment relates to the partially superceded 1982 planning rule, the Forest Service emphasized that "only the aspects of § 219.19 in the 1982 planning rule related to *selecting MIS* (§ 219.19(a)(1))**[2]** and *monitoring* during forest plan implementation (§ 219.19(a)(6))**[3]** apply. *Other aspects of § 219.19* are related to forest plan development or revision and *do not apply*." (Emphasis added). Accordingly, Earth Island's reliance on 36 C.F.R. § 219.19 is unavailing.

**[8]** Our role is "simply to ensure that the Forest Service made no clear error of judgment that would render its action arbitrary and capricious." *McNair*, 537 F.3d at 993 (quotation marks omitted). This was not the case here. Courts may not impose "procedural requirements not explicitly enumerated in the pertinent statutes." *Id.* (alteration omitted). Accordingly, the district court did not abuse its discretion when it concluded that Earth Island was not likely to succeed on the merits of its argument that in analyzing and implementing the project at issue, the Forest Service was required to ensure species viability.

---

**[2]**Providing, in pertinent part, that "[i]n order to estimate the effects of each alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species and the reasons for their selection will be stated."

**[3]**"Population trends of the management indicator species will be monitored and relationships to habitat changes determined. This monitoring will be done in cooperation with State fish and wildlife agencies, to the extent practicable."

### ii. Forest Service Responses to Earth Island's Comments

Earth Island contends that the district court abused its discretion in finding that the Forest Service adequately responded to the dissenting scientific comments submitted by Earth Island's scientists during the RFEIS comment period. In particular, Earth Island alleges that the Forest Service responded in an impermissibly generalized manner and that the RFEIS did not address certain specific comments by Earth Island's experts, Mr. Rhodes and Dr. Royce.

**[9]** Under NEPA, agencies must ensure the scientific integrity of the discussions and analyses in their environmental impact statements. 40 C.F.R. § 1502.24. In doing so, they must "discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b). However, agencies have broad discretion in choosing how to respond to opposing scientific evidence. 40 C.F.R. § 1503.4. Nonetheless, the EIS "must respond explicitly and directly to conflicting views in order to satisfy NEPA's procedural requirements." *Earth Island II*, 442 F.3d at 1172. That being said, "an agency need not respond to every single scientific study or comment." *Castaneda*, 574 F.3d at 668.

**[10]** First, the district court cited to numerous instances in the RFEIS where the Forest Service responded in detail to the specific comments raised by Earth Island. For example, the court found that the Service commented on the adequacy of the roadside hazard tree guidelines, the alleged improper markings of hazard trees, the impact on woodpeckers and their habitat, and the impact of logging on post-fire soils and watersheds. Thus, Earth Island's contention that the Service only responded in a generalized manner is factually incorrect. The district court did not abuse its discretion in so finding.

**[11]** Second, the Forest Service responded extensively to the comments by both Mr. Rhodes and Dr. Royce. The Forest Service responded to Mr. Rhodes' comments on ground cover loss and landing sites for helicopter and skyline logging in both the body of the FREIS and in the Appendix. Mr. Rhodes disagrees with the Forest Service's scientific findings, but that disagreement does not render the Forest Service's review and comment process improper. "[N]one of NEPA's statutory provisions or regulations requires the Forest Service to affirmatively present every uncertainty in its EIS . . . . After all, to require the Forest Service to [do so] would be an onerous requirement, given that experts in every scientific field routinely disagree . . . ." *See McNair*, 537 F.3d at 1001. The district court here found just such a "battle of the experts" to exist, but concluded that this did not establish a violation of NEPA. It was within its authority to do so.

**[12]** Similarly, the RFEIS responded in detail to Dr. Royce's comments on the roadside hazard tree guidelines. For example, the RFEIS discussed the environmental effects of roadside hazard tree removal and explained why the Forest Service guidelines are consistent with scientific recommendations regarding fire-injured trees. The RFEIS also discusses a concern raised by an Earth Island expert regarding assumptions about the likely fall rates of burned trees. In short, the RFEIS took the required hard look at the determination of which trees were hazardous to road travelers. The Forest Service responded in a sufficiently detailed manner to the range of comments submitted. NEPA requires no more. *McNair*, 537 F.3d at 1000, 1003. Accordingly, the district court did not abuse its discretion in finding that the Forest Service met its comment period obligations.

### iii. *Enforceability of Tree Marking Guidelines*

**[13]** Earth Island contends that the Forest Service did not follow its allegedly enforceable tree marking guidelines. In arguing that the guidelines were binding, Earth Island cites to

language from the Record of Decision and the RFEIS stating that the Forest Service shall "[u]se the best available information for identifying dead and dying trees," that "[h]azard trees proposed for felling have been identified using the PNF Roadside/Facility Hazard Tree Guidelines," and that the objective of the project is to "[r]emove roadside safety hazards." The guidelines themselves are contained in a "Roadside/Facility Hazard Tree Abatement Action Plan," the purpose of which is to "provide parameters for the abatement of road and facility hazard trees." Further, "[t]he *spirit* of these guidelines is to: 1) remove those trees that would likely die to abate potential hazards to visitors . . . and 2) retain those trees that will likely survive. . . . *This balance aims* to retain healthy forest cover . . . ." (Emphasis added). Such language does not make the guidelines enforceable. In order for an agency document to have the force and effect of law, it must "(1) prescribe substantive rules — not interpretive rules, general statements of policy or rules of agency organization, procedure or practice — and, (2) . . . [be] promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress." *W. Radio Serv. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996) (concluding that agency manual and handbook were not legally enforceable as they were neither substantive in nature nor promulgated in accordance with the Administrative Procedure Act). Here, the language of the guidelines similarly shows that they were not substantive, but provided only internal guidance and parameters for the abatement of danger from hazard trees. Earth Island further fails to show that they were promulgated pursuant to a specific grant of congressional authority. Even if they were enforceable, Earth Island fails to show how the Forest Service failed to observe them given the fact that one of the project purposes was to remove burned trees posing a safety hazard to road traffic in the project area while reestablishing the forest. This balance is precisely what the guidelines call for. Accordingly, the district court did not abuse its discretion in finding that the guidelines were not enforceable.

[14] In short, the district court used the correct standard for analyzing Earth Island's likelihood of success on the merits

and did not abuse its discretion in finding that Earth Island failed to show that it was likely to succeed on the merits of its NFMA claims.

### B.   Likelihood of Irreparable Harm

Earth Island claims that the district court abused its discretion in conflating the merits and likelihood of irreparable harm inquiries. This argument is unavailing. In one instance, the court referred to Earth Island's likelihood of success on the merits in connection with its irreparable harm analysis. However, this should come as no surprise as there is significant overlap between these two issues. *Winter* does not stand for the proposition that courts may never evaluate one factor without looking to another, as Earth Island argues.

Earth Island also contends that the district court failed to realize that both the possible imminence of the alleged harm and the severity thereof must be analyzed under this prong. This argument does find basis in the record. The district court's analysis shows that the court fully understood and correctly applied this second *Winter* prong. For example, the court analyzed both whether it was *likely* or merely *possible* that the alleged harm would take place. Pointing out that a showing of a mere possibility of irreparable harm is not sufficient under *Winter*, the court found that Earth Island had, at most, showed such a possibility, but no likelihood of irreparable harm. Further, Earth Island's argument that logging is per se enough to warrant an injunction because it constituted irreparable environmental harm was squarely rejected by *McNair* where we declined "to adopt a rule that *any* potential environmental injury *automatically* merits an injunction." 537 F.3d at 1005 (noting that this is particularly so where plaintiffs are also found not likely to succeed on the merits of their claims.).

Finally, Earth Island asserts that the district court abused its discretion in "essentially" requiring it to show that the project

would render the entire regional population of woodpeckers unviable. Nowhere did the district court require Earth Island to demonstrate the species-level harm that Earth Island contends.

**[15]** In short, the district court correctly analyzed the likelihood of irreparable harm in sufficient depth without impermissibly conflating this with the other required factors.

## C.  *Balancing of the Equities and Public Interest*

**[16]** Finally, Earth Island argues that in balancing the equities and considering the public interest, the district court assigned too much weight to the Forest Service's asserted economic injury, the Forest Service's risk assessment and the Forest Service's determination that reforestation was in the public's interest. To be sure, district courts must "give serious consideration to the balance of equities and the public interest." *Winter*, 129 S. Ct. at 368. However, "[a]n injunction is a matter of equitable discretion." *Id.* at 381. The assignment of weight to particular harms is a matter for district courts to decide. The record here shows that the district court balanced all of the competing interests at stake. For example, the court stated that whereas "the balance of harms will usually favor the issuance of an injunction to protect the environment," the law also did not allow it "to abandon a balance of harms analysis just because a potential environmental injury is at issue" and that it "must balance all of the competing interests at stake."

**[17]** Earth Island argues that the district court gave too much weight to the economic harm alleged by the Forest Service. It is true that the district court considered the government's interest in recovering the highest possible value of the timber and providing a boost to the local economy by creating jobs in the local logging industry. However, the district court did not clearly err in finding that the economic stakes, in combination with the safety concerns and reforestation efforts,

outweighed any harm to environmental interests. Economic harm may indeed be a factor in considering the balance of equitable interests. *See, e.g., Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987) (concluding that where asserted environmental injury was "not at all probable," economic interest was properly given more weight); *McNair,* 537 F.3d at 1005 (holding that the district court did not clearly err in concluding that the balance of harms did not tip in environmental organization's favor where a Forest Service project would "further the public's interest in aiding the struggling local economy and preventing job loss.").

**[18]** Earth Island further argues that the district court erroneously found that if the injunction were issued, the public would be at risk from falling roadside hazard trees and erred in not considering its request[4] for a tailored injunction that allowed for only the felling of trees in imminent danger of falling. To be sure, district courts have "broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Sierra Hikers Ass'n v. Blackwell,* 390 F.3d 630, 641 (9th Cir. 2004). However, courts must always carefully "balance the competing claims of injury." *Winter,* 129 S. Ct. at 376. In doing so here, the district court carefully scrutinized both the written record regarding the fall rates of trees affected by fires as well as the extensive testimony by experts asserting the dangers posed by roadside hazard trees to the general public and forest employees. The court concluded that these safety concerns weighed in favor of not issuing the injunction. It did not abuse its discretion in doing so.

---

[4]This alleged request took the form of Earth Island's statements on page 24 of its memorandum in support of the preliminary injunction that it did not "object to structurally damaged imminent hazard trees being felled and left on site." It was thus not the clear request for alternative relief that Earth Island contends. *See, e.g. Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) (concluding that the district court had the power to issue a narrow injunction specifically requested by plaintiffs). Regardless, we will address the requested remedy here as if it had been.

**[19]** Finally, Earth Island contends that the district court erred in finding that salvage logging was necessary to promote forest regeneration. The court evaluated expert testimony that absent logging of fire-killed and fire-injured trees in combination with the planting of conifer seedlings, brush species would eventually dominate the area resulting in an increase of the cost, difficulty and failure rate of subsequently converting the area into suitable woodpecker habitat. The court concluded that if the injunction was granted, the public would lose the immediate benefits of the reforestation efforts. It did not abuse its discretion in doing so.

## CONCLUSION

For the above reasons, the district court correctly denied Earth Island's motion for a preliminary injunction enjoining the Forest Service's implementation of the Moonlight-Wheeler project.

**AFFIRMED.**

---

REINHARDT, Circuit Judge, dissenting:

The majority's denial of a preliminary injunction, like the district court's before it, rests on two fundamental errors. First, the majority concludes that the Forest Service has no obligation to ensure species viability in the Plumas National Forest despite numerous clear statements to the contrary in the Plumas National Forest Plan. Second, it concludes that the RHT Hazard Tree Marking Guidelines are not binding on the Forest Service despite the fact that the Forest Service itself acknowledges that they are. The district court rested its denial of a preliminary injunction almost entirely on its erroneous conclusions regarding Earth Island's likelihood of success on the merits. I would therefore grant a temporary injunction and remand to the district court to reconsider Earth Island's appli-

cation for a preliminary injunction with the understanding that, as is explained below, Earth Island is likely to prevail on its NFMA challenges to the Moonlight-Wheeler Project.

## I.

The Forest Service's actions in implementing the Moonlight-Wheeler Project violated a substantive obligation, enforceable under the NFMA, to ensure the viability of the Black-backed Woodpecker. To avoid this conclusion, the majority wilfully ignores unambiguous language in the 2004 and 2007 Forest Plan Amendments, which impose a binding obligation to ensure species viability in the Plumas National Forest, as well as our precedent, which makes this obligation applicable to individual projects, such as the Moonlight-Wheeler Project.

## A.

The viability requirement that Earth Island alleges the Forest Service violated was originally stated in the first paragraph of the so-called 1982 Rule, 36 C.F.R. § 219.19 (1982). It reads:

> Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

*Id.* Although the majority is correct that the regulation itself has since been superceded, its requirements still apply "to the extent they were incorporated into [a] Forest Plan." *Castaneda*, 574 F.3d at 657. The majority appears to conclude that the 1982 Rule was *not* incorporated into the Plumas National Forest Plan by the 2004 amendments, and that therefore the Forest Service has no obligation to ensure species viability. This conclusion is contrary not only to the district court's finding that the 1982 Rule was incorporated into the 1993 Forest Plan and the 2001, 2004, and 2007 Forest Plan Amendments, but also to this court's explicit prior holding that the 2004 amendments *did* incorporate the 1982 Rule. ER Vol. 1, Tab 1, page 18 ("The Forest Plan and all amendments rely on the 1982 version of the 36 C.F.R. § 219 NFMA regulations.").[1] *See Earth Island Inst. v. U.S. Forest Service*, 442 F.3d 1147, 1173 (9th Cir. 2006) ("As a preliminary matter, we conclude the NFMA regulations promulgated in 1982 apply to the . . . 2004 [amendments]."[2] *Id.* at 1173.

Moreover, even if binding precedent did not foreclose the majority's conclusions that the 1982 Rule does not apply and

---

[1]Neither party appears to dispute that the 2001 amendments incorporated the 1982 Rule's viability requirement. As the Record of Decision for those amendments stated:

> My decision conforms with the 1982 planning regulations (36 CFR 219) that implement the National Forest Management Act. These regulations were recently changed. . . . Transition language within the new rule permits plan revisions and amendments, such as the amendments that are part of my decision, to be completed under the 1982 procedures.

The document then proceeds to discuss the amendments' compliance with the 1982 Rule. Thus, the only question is whether either the 2004 or 2007 amendments eliminated the Forest Service's preexisting obligation to ensure species viability consistent with the 1982 Rule.

[2]*Earth Island* addressed a project in the El Dorado National Forest. Like Plumas National Forest, El Dorado is governed by the 2001 Sierra Nevada Framework Plan and the 2004 amendments to that framework. *See id.* at 1154.

there is therefore no viability requirement, these conclusions could not be supported by a sensible reading of the relevant forest plan amendments. The 2004 amendments to the Plumas National Forest Plan, for example, could not have been more clear in incorporating the 1982 Rule and imposing a viability requirement upon the Forest Service. In the Record of Decision implementing the 2004 amendments, the Forest Service's Regional Forester for the Pacific Southwest Region stated that, "[m]y decision conforms with the 1982 planning regulations (29 CFR 219) that implement the National Forest Management Act." The document's following subsection is entitled, "Diversity and *Viability* Provisions for Fish and Wildlife," (emphasis added), and concludes by requiring the Forest Service to "provide the fish and wildlife habitat and other ecological conditions necessary to maintain well-distributed viable populations of vertebrate species in the planning area." (Emphasis added). The majority suggests that this statement "could be read to mean that the Service was to ensure the *distribution* of the species," but not their viability. Maj. Op. at 18415. In fact, it cannot. To do so, one would first be required to ignore the fact that this statement follows shortly after the amendments' explicit adoption of the 1982 Rule; one would then have to ignore the fact that the statement falls under a heading pertaining to "Viability Provisions"; and finally, one would have to willfully overlook the presence of the word *viable* in the statement itself. There is no canon of construction that allows us to ignore words we deem inconvenient. Such a willful misreading is especially unacceptable, where, as here, the context in which the word "viable" appears makes perfectly clear that its inclusion in the amendments was deliberately intended to impose upon the Forest Service a viability requirement consistent with the 1982 Rule.

The majority likewise errs in its conclusion that the 2007 amendments do not impose a viability requirement. It so concludes because, in addressing requirements for Management Indicator Species such as the Black-backed Woodpecker, the

Amendments require only "[d]istribution population monitoring [to] track changes in the distribution of each MIS at the Sierra Nevada scale by monitoring the changes in the presence of the species across a number of sample locations," and state that "[t]he sole MIS requirement that is applied at the project-level is the assessment of habitat for MIS. Further, there are no monitoring requirements for MIS at the project level." But this language is simply irrelevant to whether or not the Forest Service is obligated to ensure species viability. The 2007 amendments made clear that the species viability requirement and the MIS monitoring requirement are separate and distinct provisions, and that though the Amendment changed MIS monitoring requirements, it had no effect whatsoever on the Forest Service's pre-existing obligation to ensure viability under the 1982 Rule:

> *This Amendment does not change the viability requirements*. The viability requirements at the planning area scale are described under the first paragraph of the [1982 Rule]; these have already been met in each forest plan, as revised. *Forests will continue to ensure that the project-level viability requirements are met*: "Provide for adequate fish and wildlife habitat to maintain viable population of existing native vertebrate species" (36 C.F.R. 219.27(a)(6)). This is documented in project-level analysis . . . . The project-level MIS requirements . . . will *also* be documented in project-level analysis.

FEIS Appendix G at 338. The Final Environmental Impact Statement for the 2007 amendments likewise stated that "[m]anagement for conservation of all species, regardless of *whether they are designated as MIS or not*, is governed by . . . the general viability requirements of the National Forest Management Act implementing regulations." FEIS at 56 (emphasis added). The 2004 and 2007 amendments impose a viability requirement upon the Forest Service that is distinct from the MIS monitoring requirement, and Forest Service must satisfy

*both* requirements to be in compliance with the NFMA. Although the majority's extensive discussion of how the Moonlight-Wheeler Project satisfies the 2007 MIS monitoring requirement may well be correct, it is completely beside the point. The question at issue in this case is not whether or not the Forest Service has met its obligations to monitor MIS species, but whether or not it has satisfied the viability requirements so clearly set forth in the 2004 and 2007 amendments.

B.

Our precedents have been deliberately flexible in defining what the Forest Service must do when, as here, a Forest Plan requires it to ensure species viability in the administration of a given national forest. *See, e.g.*, *The Lands Council v. McNair*, 537 F.3d 981, 997 (9th Cir. 2008) (en banc) ("To always require a particular type of proof that a project would maintain a species' population in a specific area would inhibit the Forest Service from conducting projects in the National Forests."). However, two principles are clear. First, contrary to the majority's repeated efforts to assert that even if a viability requirement exists it does not apply at the project level, a viability requirement that is applicable at the planning level necessarily applies to and constrains individual projects undertaken in a national forest:

> [C]ompliance with NFMA's forest-wide species viability requirements is relevant to the lawfulness of any individual timber sale. To hold otherwise would permit the Forest Service to don blinders to the overall condition of a national forest each time it approved a sale, quite literally losing sight of the forest for the trees. This would contravene "one of the fundamental purposes of Congress in enacting [NFMA]: that the National Forest System be managed with 'a systematic interdisciplinary approach,' by means of 'one integrated plan for each unit of the National Forest System.' " *Idaho Sporting Cong. v.*

> *Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) (quoting
> 16 U.S.C. § 1604).

*Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1069 (9th Cir. 2002); *see also McNair*, 537 F.3d at 989 ("After a forest plan is developed, *all subsequent agency action, including site-specific plans . . .* must comply with the NFMA and be consistent with the governing forest plan.").

Second, the NFMA requires that when a viability requirement is included in a Forest Plan, the Forest Service must affirmatively demonstrate that any given project satisfies its obligation to ensure species viability. *McNair*, 537 F.3d at 992-94. Such a demonstration is to be reviewed deferentially, *see id.* at 992 ("[W]e defer to the Forest Service as to what evidence is, or is not, necessary to support wildlife viability analyses."), but, at the least, the Forest Service must:

> support its conclusions that a project meets the [viability] requirements of the . . . relevant Forest Plan with studies that the [Forest Service], in its expertise, deems reliable. The Forest Service must explain the conclusions it had drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable.

*Id.* at 994. In *McNair*, for example, the Forest Service supported its conclusion that a project in the Idaho Panhandle National Forest provided for the Flammulated Owl's viability by citing to several scientific studies pertaining to the owl's habitat preferences and conducting on-the-ground analysis of the owl in an area adjacent to the project area. *Id.* at 994. That "relatively sparse" showing, we stated, "approaches the limits of our deference." *Id.* at 995.

In implementing the Moonlight-Wheeler Project, the Forest Service failed to meet even these minimal obligations. The agency did not reach a conclusion that the Project would

ensure species viability, let alone did it support such a conclusion, as the NFMA requires, with studies and methodological explanations sufficient to establish that its actions were not arbitrary or capricious. The agency argues that it satisfied its obligations through analysis that it undertook in fulfillment of the Forest Plan's unrelated requirement that it "assess wildlife habitat," and the majority asserts that it need not demonstrate project-level species viability at all. Where the Forest Service seeks to use habitat as a proxy for species viability it "must describe the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat." *McNair*, 537 F.3d at 998. The Forest Service has not done so in this case, and its conclusion that the project would, despite undoing some habitat gains from the Moonlight fires, "still support an upward trend in [Black-backed Woodpecker] population," tell us nothing about whether the project interferes with the Woodpecker's viability. The Forest Service's essentially non-existent conclusions regarding species viability thus fall far short of the conclusions that "approach[ed] the limits of our deference" in *McNair*. *Id.* at 995.

The Forest Service's decision to simply ignore a binding viability requirement in the Plumas National Forest Plan violates the NFMA. *See* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."). Earth Island has thus shown that it is extremely likely to prevail on the merits of its NFMA claim. The district court was wrong to conclude otherwise, and because its application of the preliminary injunction test turned predominantly on this erroneous conclusion, I would grant an injunction pending appeal and issue a limited remand to allow the district court to reconsider Earth Island's request for a preliminary injunction. The majority is simply wrong when it says that species viability on a project level is not required.

II.

The majority further errs in its conclusion that the Forest Service was not bound by the RHT Guidelines for identifying and marking hazardous trees. The majority, like the district court, concludes that the RHT Guidelines are not enforceable. It reaches this conclusion based on the presence of certain non-mandatory phrases in the Guidelines, as well as its conclusion that the Guidelines were not promulgated pursuant to a specific congressional grant of authority. However, both of these arguments for the non-enforceability of the Guidelines are erroneous.

First, the fact that the Guidelines use non-mandatory phrases to describe their general objectives, does not, as the majority suggests, render them unenforceable. *See* Maj. Op. at 18419-20. The majority emphasizes two such uses of non-mandatory phrases—one is a reference to "[t]he spirit of these guidelines"; the other states that the "balance [struck by the Guidelines] aims to retain healthy forest cover"—and somehow arrives at the conclusion that the Guidelines were intended only to provide "internal guidance and parameters" for the marking of hazardous trees. *Id.* In fact, notwithstanding such general statements, the guidelines are predominantly phrased in mandatory language, and impose specific requirements on which trees may be marked for removal. *See, e.g.*, ER II, Tab 16 at 1-2 ("Mark for removal any hazard tree capable of falling on a road or facility that meets the following criteria . . . .").

Second, the majority's conclusion that Earth Island "fails to show that [the Guidelines] were promulgated pursuant to a specific grant of congressional authority" is incorrect. The 2004 amendments to the Plumas National Forest Plan state that the Forest service must "[u]se the best available information for identifying dead and dying trees for salvage purposes as developed by the Pacific Southwest Region Forest Health Protection Staff," and the Forest Service concedes that "the

Plumas Forest Plan, as amended, contemplates that salvage projects will use the RHT Guidelines." Moreover, a portion of the guidelines was explicitly incorporated into the Moonlight-Wheeler Project. The Forest Service thus clearly adopted the Guidelines pursuant to a congressional grant of authority, namely, its authority under the NFMA to develop and execute Forest Plans. *See* 16 U.S.C. § 1604(e) ("In developing, maintaining, and revising plans for units of the National Forest System pursuant to this section, the Secretary shall assure that such plans . . . determine forest management systems, harvesting levels, *and procedures* in the light of all of the uses set forth in subsection (c)(1) of this section.") (emphasis added).

Because the RHT Guidelines were incorporated into the Plumas National Forest Plan, the district court erred in concluding that they are unenforceable. This erroneous conclusion kept the district court from deciding whether the factual foundation of Earth Island's allegations regarding violations of the Guidelines was sufficiently strong to warrant an injunction under the test set forth in *Winter v. Natural Res. Def. Council,* 129 S. Ct. 365, 374 (2008).[3] Its denial of a preliminary injunction regarding the tree marking guidelines—and the majority's affirmation of that denial—was thus based entirely on the faulty legal conclusion that the RHT Guidelines do not impose any enforceable obligations upon the Forest Service. I would therefore remand this issue to the district court for further proceedings to determine whether, given that the Guidelines create legally binding obligations, Earth Island has alleged facts sufficient to satisfy the *Winter* test and,

---

[3]While the district court expressed significant skepticism toward several of Earth Island's arguments regarding the Guidelines, it did so in addressing Earth Island's NEPA claims. The NEPA claims that the district court addressed are distinct from the claims at issue in Earth Island's NFMA claim. Whereas the former address the validity of the Guidelines and whether the Forest Service adequately responded to Earth Island's comments on the subject, the latter address whether or not the Forest Service actually adhered to the Guidelines. *See* Dist. Ct. Op. at 20.

accordingly, to warrant the issuance of a preliminary injunction.

## III.

The district court failed to address the last three factors of the *Winter* test —likelihood of irreparable injury, the balance of the harms, and the public interest—as questions distinct from Earth Island's likelihood of success on the merits. Rather, it addressed each of the three remaining preliminary injunction factors as if they were settled by its finding that Earth Island was unlikely to succeed on the merits of its claim.[4] Had the district court analyzed these three factors without reference to its erroneous conclusions regarding Earth Island's likelihood of success, it may well have been compelled to conclude that a preliminary injunction was appropriate.

Regarding whether the harm suffered by Earth Island is irreparable, the Supreme Court has stated that because "[e]nvironmental injury, by its very nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration [it is] irreparable." *Amoco Production Co. v. Gambell*, 480 U.S. 531, 545 (1987). We have thus repeatedly recognized that the irreversible environmental effects of logging activity suffice to establish "irreparable harm" for purposes of obtaining a preliminary injunction. *See, e.g.*, *Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1382 (9th Cir. 1998); *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1314 (9th Cir. 1990).[5] Here, Earth Island has alleged that if the snag for-

---

[4]*See, e.g.*, Dist. Ct. Op. at 63 ("Considering the court has found that it is unlikely plaintiff can demonstrate any clear error in judgment by the [Forest Service] in rendering its decision on the Project's impacts to wildlife and the soils and watersheds, the court cannot find that plaintiff has shown a likelihood of irreparable harm.").

[5]The district court concluded that such cases no longer had precedential value following *Winter v. Natural Res. Def. Council,* 129 S. Ct. 365

est habitat created by the 2007 fires is logged, it will be permanently lost as potential habitat for the Black-backed Woodpecker and other species. The district court expressed skepticism that this logging project would ultimately precipitate the extinction of the Black-backed Woodpecker in the Sierra Nevadas, a question that is difficult to answer given the shoddiness of the Forest Service's analysis of that issue. But Earth Island need not be required to prove with certainty that the project will lead to the Woodpecker's extinction to establish that it will be irreparably harmed. There is no dispute that the project will destroy thousands of acres of rare habitat that is critical for the Woodpecker's survival. As such, there is more than a likelihood—there is an absolute certainty—that Earth Island was and will continue to be irreparably harmed by the denial of an injunction.

The district court likewise committed serious errors in its analysis of the public interest and the balancing of the equities. First, as in its analysis of irreparable harm, the district court's treatment of these factors rested largely on its erroneous conclusion that Earth Island was unlikely to prevail on the merits. It stated, "While the court must seriously consider the potential harm to the environment caused by the Project, where plaintiff has not made the requisite showing on the merits which, in turn, undermines the likelihood of irreparable injury, the balance of equities cannot be found in plaintiff's favor." (Emphasis added).

Second, the district court conducted its analysis as though Earth Island had sought an injunction broader than the one it

(2008). *Winter* held that a party seeking a preliminary injunction must show a *likelihood* of irreparable harm, overruling Ninth Circuit precedent requiring only a showing of a *possibility* of irreparable harm. *Id.* at 375-76. However, this holding has no bearing on whether a certain category of alleged harm is in fact irreparable. These precedents thus remain valid to the extent they make clear that the sort of environmental harm that Earth Island anticipates in this case is irreparable in nature.

expressly requested. On the same day it filed its motion for a preliminary injunction, Earth Island filed a proposed preliminary injunction order. The proposed order explicitly states that the Forest Service "may fell and leave trees or remove naturally fallen trees to the side of the roadway under emergency circumstances pursuant to 36 C.F.R. § 220.4(b)(1)", but may not remove any such trees from the project area. *Id.* The cited regulation allows "actions necessary to control the immediate impacts of the emergency and . . . urgently needed to mitigate harm to life, property, or important natural or cultural resources."

In the reply brief it filed with the district court in support of its request for a preliminary injunction, Earth Island emphasized the safety exception contained in its proposed order, and added that "[i]f this Court is convinced that the allowances made by Plaintiff in [its] Proposed Order are not sufficient to safeguard the public from harm, . . . . the Court could merely identify some segment of the trees marked for cut as hazards to be logged, while enjoining the rest of the project." Yet the district court, in its analysis of the public interest and the balance of the equities, explicitly relied on evidence that "a real safety risk exists to the public as a result of hazardous trees," — a risk that the Forest Service would retain the authority to address even if the requested preliminary injunction were issued. The district court thus violated the requirement that "[w]hen deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009). Had the district court evaluated the narrow injunction Earth Island requested and thus not incorrectly concluded that an injunction would pose a threat to the public safety, it would have been left with only two bases for concluding that the balance of the equities and public interest support an injunction: economic harm to the community and government, and loss of the "benefits of reforestation." The latter of these is clearly not a legitimate basis for denying a

preliminary injunction—even if reforestation is not occurring naturally, there is no reason why the steps necessary to ensure reforestation cannot be undertaken following a decision on the merits.

The district court's denial of an injunction was thus flawed in a number of respects, as is the majority's affirmation of that denial. It failed to recognize Earth Island's strong likelihood of success on the merits as well as the irreparable harm that would befall Earth Island absent an injunction. Likewise, its treatment of the public interest and the balance of the equities rested largely on the court's flawed analysis of the merits of the case, and failed to account for the narrow scope of the injunction Earth Island requested. I therefore must disagree strongly with the majority. I believe that Earth Island is entitled to an injunction pending appeal, as well as a limited remand to allow the district court to consider whether, in light of its likelihood of success on the merits, the irreparable nature of its foreseeable harm, and the narrow scope of the injunction it requested, it is entitled to a preliminary injunction.